**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| WESTCHESTER SURPLUS LINES | § | |
| INSURANCE COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-07-540 |
| | § | |
| MAVERICK TUBE CORPORATION, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER**

This is an insurance coverage dispute between Maverick Tube Corporation and its insurer, Westchester Surplus Lines Insurance Company. Westchester sued Maverick, seeking a declaratory judgment that a commercial general liability policy and umbrella policy did not cover Maverick's settlement of a breach of warranty claim asserted by one of its customers, Dominion Exploration and Production Company. Dominion claimed that drill casing manufactured by Maverick and sold through its distributor failed due to a defect in the manufacturing process. Westchester and Maverick cross-moved for summary judgment on coverage. Another judge in this district held that the policies did not cover Dominion's claim because the casing failure was not an "occurrence." Maverick appealed and the Fifth Circuit reversed. *Westchester Surplus Lines Ins. Co. v. Maverick Tube Corp.*, 590 F.3d 316 (5th Cir. 2009). The appellate court held that the casing failure was an "occurrence" and remanded "for a determination of damages." *Id.* at 324. The judge who decided the case prior to appeal recused and the case was reassigned to this court.

The parties have submitted statements of the issues to be decided. (Docket Entry Nos. 88, 89, 93). Maverick has moved for entry of final judgment, (Docket Entry Nos. 90, 96), and

Westchester has responded, (Docket Entry No. 94).  The parties presented oral argument at a hearing.  The issues on remand are as follows:

- whether there was more than one "occurrence," which would reduce Maverick's recovery because of the per-occurrence self-insured retention;

- whether Westchester waived or forfeited the argument that there were multiple occurrences;

- whether Maverick is required to allocate the settlement with Dominion between covered and uncovered claims;

- whether Maverick is entitled to attorneys' fees and, if so, in what amount; and

- when the claim accrued for the purpose of calculating prejudgment interest.

Based on the record, the parties' filings, the arguments of counsel presented at a hearing, and the applicable law, this court rules that: Westchester did not waive or forfeit the multiple-occurrence argument; the casing failure was a single occurrence; there are no uncovered damages included in the settlement Maverick paid to Dominion and therefore no duty to allocate the payment between covered and uncovered claims; Maverick is not entitled to attorneys' fees; and prejudgment interest began to accrue on January 25, 2007.  Based on these rulings, final judgment is appropriate.  By **July 9, 2010**, the parties must confer and submit a proposed final judgment consistent with this opinion.

The reasons for these rulings are explained below.

## I.      Background

The facts of this case have been described in the prior opinions by the Fifth Circuit, 590 F.3d 316 (5th Cir. 2009), and by the district judge who previously presided over this case, (Docket Entry

No. 55).  The parties submitted stipulated facts on remand.  (Docket Entry No. 95).  They include the following:

1.  Maverick purchased commercial general liability insurance policy number G22033621001 (the "Primary Policy") and umbrella insurance policy number G2198615A001 ("Umbrella Policy") (collectively, the "policies") from Westchester.  The policies were originally in effect from October 1, 2005, to October 1, 2006.

2.  The Primary Policy has a $1,000,000.00 limit of liability per occurrence and a $2,000,000.00 products-completed operations aggregate limit, subject to a Self-Insured Retention ("SIR") of $350,000 per occurrence.

3.  The Umbrella Policy provides coverage of $25 million for each occurrence in excess of the scheduled underlying coverage.  It has a $25 million general aggregate limit and a $25 million products/completed operations aggregate limit.

4.  The Primary Policy defines "occurrence" as "[a]n accident, including continuous or repeated exposure to substantially the same general harmful conditions."  The Umbrella Policy defines occurrence as "[a]n accident, including continuous or repeated exposure to substantially the same general harmful conditions that results in 'Bodily Injury' or 'Property Damage' that is not expected or intended by the 'Insured'."

5.  In July and August 2006, Maverick sold at least 1,306 pieces of a specific type of casing, P-110, to its distributor to be shipped to Dominion Exploration and Production Company ("Dominion") for use and operation in multiple gas wells.

6.  During a two-week period in early September 2006, Dominion experienced failures in four different gas wells that incorporated Maverick's P-110 casing.

7.  The casing provided to Dominion failed due to a manufacturing defect at Maverick's processing facility in Colombia.

8.  On November 29, 2006, Dominion sent a written demand to Maverick for $9,802,506.00 for (1) the costs incurred to

originally drill the four wells; (2) lost revenue; (3) costs to plug and abandon the wells; and (4) costs to drill four new wells.  Dominion stated that the "failure [of the casing] falls within Maverick's published Warranty Policy for its API and Proprietary grade casing and tubing," and thanked Maverick for the acknowledgment of that fact.

9.  Westchester responded to Dominion's claim against Maverick with a letter on December 13, 2006, and another letter on January 25, 2007.

10.  Maverick settled with Dominion on March 16, 2007 for $6,601,035.39.

11.  The settlement excluded a $350,000 [self-insured retention] for one occurrence, and the cost of the casing, $808,390.61, both of which were paid separately by Maverick.

(*Id.* at 1-3).

Other evidence in the record provides further detail.  Dominion's November 26, 2006 demand letter explained the damage to the four wells and stated that Maverick had investigated and confirmed the reported damage.  The letter concluded that "[b]ased on our prior meetings and discussions, it is our understanding that Maverick is satisfied that Dominion's loss is a result of the casing failure, and that such failure falls within Maverick's published Warranty Policy for its API and Proprietary grade casing and tubing."  (Docket Entry No. 46, Ex. J at 5).  Dominion separately broke out the four categories of damages sought — completion costs, lost production/revenue, plugging liability, and redrilling costs — for each of the four wells, for a total of $9,802,506.00.  Dominion stated that it had "considered several alternative methods of resolving this matter, and ha[d] decided that the easiest to administer would be a lump sum payment in exchange of a complete release of all claims."  (*Id.* at 6).  Dominion offered to "release all claims associated with this matter in exchange of the total sum of $9,802,506.00."  (*Id.*).  After receiving this letter, Maverick forwarded it to Westchester via e-mail on December 7, 2006.  In the transmittal e-mail, Maverick

4

stated that it attached "our cover letter, Dominion Exploration and Production, Inc's claim letter, and three investigative documents concerning claims for which you were notified initially on or about September 6, 2006." (*Id.* at 2).  As the Fifth Circuit stated, "[t]hese investigations and reports showed that Maverick and [its subsidiary] were responsible for Dominion's damages." *Westchester*, 590 F.3d at 318.  Maverick asked Westchester to pay Dominion's proposed settlement.  (Docket Entry No. 46, Ex. J at 2, 4).  Westchester received Maverick's letter on December 7, 2006.  (Docket Entry No. 90, Ex. A-1 at 1).  Westchester's first response, dated December 13, 2006, informed Maverick that "[w]hile we are still investigating this matter, and are requesting certain additional information, discussed below, at this time I must respectfully reserve the rights of [Westchester] to deny, disclaim or limit coverage for this matter." (*Id.*).  After recounting the facts of the underlying dispute described in Dominion's demand letter and quoting the relevant provisions of the insurance policies, Westchester stated again that it "specifically reserves its rights to deny, disclaim or limit coverage under the umbrella policy" for a variety of reasons.  (*Id.* at 7).  Westchester also requested a number of specific documents relating to the claim.  (*Id.*).  At the end of the letter, Westchester once again stated that its "position as set forth herein is preliminary, based on the information that has been provided to date," and asked Westchester to provide quickly the requested information as well as "any additional information that you believe should be considered." (*Id.* at 7-8).

On December 20, 2006, Maverick responded to Westchester's letter with an e-mail stating that it would attempt to provide all requested information by December 22.  The e-mail conveyed Maverick's concern that a delay in responding to the settlement offer might jeopardize its relationship with Dominion, "a major customer," and asked for Westchester's written consent to tender the $350,000 self-insured retention to Dominion.  (Docket Entry No. 46., Ex. 1-L at 2).  On January 5, 2007, Maverick sent Westchester an e-mail responding to the document request in the

5

December 13 letter.  (*Id.*, Ex. 1-M).  Among the attached documents were Dominion's invoices for the work described in the demand letter.  On January 9, 2007, Maverick sent Westchester an e-mail attaching an additional invoice received from Dominion.  (*Id.*, Ex, 1-N).

Westchester sent a January 25, 2007 letter to Maverick, written by outside counsel, stating that "the claim, as presented, does not fall within the insuring agreement."  (*Id.*, Ex. 1-O).  Westchester concluded that Dominion appeared to have a "valid breach of contract and warranty claim against Maverick" but no valid negligence claim.  (*Id.* at 3-5).  Westchester denied coverage on the basis that there was no "occurrence" under the policy definitions and that policy exclusions applied.  (*Id.* at 6-8).  Westchester reserved the right to assert other exclusions and to argue that there were multiple "occurrences."  Finally, Westchester stated that Maverick had a duty to apportion losses between covered and uncovered claims.  (*Id.* at 8).

On February 8, 2007, Westchester filed this declaratory judgment suit in this district.  The following day, Maverick filed a breach of contract action in the Eastern District of Missouri.  The breach of contract action was transferred to this district and consolidated with this suit on December 12, 2007.  (Docket Entry No. 25).  After the parties filed cross-motions for summary judgment, the district court judge then handling the case held that Dominion's claim against Maverick was not an "occurrence" under the policies, granted Westchester's motion for summary judgment, and denied Maverick's motion for summary judgment. (Docket Entry No. 55).  After Maverick's motion for reconsideration was denied, final judgment was entered on December 29, 2008.  (Docket Entry Nos. 62, 63).  Maverick timely appealed.  On December 10, 2009, the Fifth Circuit reversed.  The appellate court held that "the casing failure constituted an occurrence that resulted in property damage" and remanded the case "for a determination of damages."  *Westchester*, 590 F.3d at 324.

After the case was reassigned to this court, a status conference was held on April 21, 2010. (Docket Entry No. 86).  As ordered at the hearing, Westchester submitted a statement of the remaining issues to be considered.  (Docket Entry No. 88).  Maverick responded, (Docket Entry No. 89), and Westchester replied, (Docket Entry No. 93).  Maverick has moved for entry of final judgment, (Docket Entry Nos. 90, 96), to which Westchester has responded, (Docket Entry No. 94). A hearing was held on June 22, 2010.  The parties stipulated that no discovery was needed and no evidentiary hearing required to resolve the outstanding issues.  The parties did present oral argument on the issues and motions.  The parties' filings and the hearing clarified that the issues to be addressed are the number of occurrences, the need to segregate covered and uncovered losses, Maverick's attorneys' fees, and the amount of prejudgment interest.  These issues are analyzed below.

## II.    Multiple Occurrences

### A.    Waiver or Forfeiture

Westchester's alternative argument that there were multiple occurrences under the policy was alleged in its complaint, (Docket Entry No. 1, ¶ 14), amended complaint, (Docket Entry No. 31, ¶ 16), and answer to Maverick's complaint in the breach of contract suit, (Docket Entry No. 32, ¶ 83). Westchester included the following footnote in its summary judgment motion: "To the extent the court disagrees with Westchester's position that the claim asserted by Dominion does not constitute an 'occurrence,' Westchester reserves its right concerning the number of occurrences."  (Docket Entry No. 34 at 14 n. 66).  The district court agreed with Westchester's argument that there was no occurrence and entered final judgment on that basis without addressing the alternative argument that there were multiple occurrences.  There was no basis for Westchester to raise the issue on appeal.

7

Given this procedural posture, Westchester's failure to raise the multiple-occurrences issue on appeal did not waive or forfeit its right to raise it on remand.

This is not a case in which the *appellant* has failed to raise an additional reason for reversing the judgment in its appellate brief.  As the Fifth Circuit has stated, "[a]n *appellee* who does not desire a change in the decree appealed from is not required to cross-appeal in order to preserve his optional right to urge errors in a district court's ruling that would, if accepted by the appellate court, support an affirmance of the decree appealed from."  *Dickinson v. Auto Center Manuf. Co.*, 733 F.2d 1092, 1101 (5th Cir. 1983) (emphasis added); *see also* 18B WRIGHT, MILLER & COOPER 4478.6, at 831 ("When the outcome of the appeal is that further trial-court proceedings are held, it is not evident that anything should turn on the question whether the argument not made would have required a cross-appeal[]" or could have been asserted as an argument in the response brief).  In this case,  it would not have made sense for Westchester to raise the multiple-occurrences issue as an argument, as opposed to a cross-appeal, in its appellate brief because the issue was only tangentially related to the appeal and would not have been responsive to Maverick's arguments.

Westchester did not waive or forfeit the argument that there were multiple occurrences. Because it bears directly on the damages amount, this issue is properly considered on this remand.

### B.    The Applicable Law

The parties disagree on the outcome of Westchester's argument that there were multiple occurrences.  The parties agree, however, that Missouri law governs the question.  The parties also agree that Texas law is consistent with Missouri law on this issue and serves as a useful supplement to the relatively few relevant Missouri cases.

Under Missouri law, an insurance policy is given "'the meaning which would be attached by an ordinary person of average understanding if purchasing insurance.'" *Jones v. Mid-Century Ins.*

8

*Co.*, 287 S.W.3d 687, 690 (Mo. 2009) (quoting *Seeck v. Geico Gen. Ins. Co.*, 212 S.W.3d 129, 132 (Mo. 2007) (en banc)).  Courts should resolve ambiguities in favor of the insured.  *Jones*, 287 S.W.3d at 690.  Like other contracts, insurance policies "must be construed as a whole so as to not render any terms meaningless, and a construction that gives a reasonable meaning to each phrase and clause and harmonizes all provisions is preferred over a construction that leaves some of the provisions without function or sense."  *State ex rel. Riverside Pipeline Co., L.P. v. Pub. Serv. Comm'n*, 215 S.W.3d 76, 84 (Mo. 2007).  Similarly, under Texas law, insurance policies are interpreted using the ordinary rules of contract interpretation, with all terms read together and each clause and word given effect.  *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 748 (Tex. 2006); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d  211, 216 (Tex. 2003).  Unambiguous policies are interpreted as a matter of law and each term is given its commonly understood meaning unless defined elsewhere in the policy.  *Fiess*, 202 S.W.3d at 746; *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 8 (Tex. 2007).

### C.    Analysis

The CGL policy Westchester issued defines "occurrence" as "[a]n accident, including continuous or repeated exposure to substantially the same general harmful conditions."  The umbrella policy defines "occurrence" as "[a]n accident, including continuous or repeated exposure to substantially the same general harmful conditions that results in 'Bodily Injury' or 'Property Damage' that is not expected or intended by the 'Insured'."  Missouri courts have read similar definitions to require a "cause" approach to determine the number of occurrences.  Under this approach, "an insured's single act is considered the accident from which all claims flow."  *See Kansas Fire & Cas. Co. v. Koelling*, 729 S.W.2d 251, 252 (Mo. App. 1987); *see also Allstate Prop. & Cas. Ins. Co. v. McBee*, No. 08-0534-CV-W-HFS, 2009 WL 1124973, at *2-3 (W.D. Mo. Apr.

9

27, 2009); *State Auto Prop. & Cas. Co. v. Matty*, No. 4:08-CV-98(CDL), 2009 WL 2216605, at *3

(M.D. Ga. Jul. 20, 2009) ("Under the causation theory, the determination of whether there was one

'accident' is whether there was one negligent act or omission that was the sole proximate cause of

all the resultant damages."). This approach contrasts to the "effect" analysis used in some

jurisdictions. Under the "effect" analysis, the focus is on the number of injuries resulting from the

act, not on the number of acts by the insured. *See Matty*, No. 4:08-CV-98(CDL), 2009 WL 221605,

at *4 (collecting cases).[1]

The parties have identified two Missouri cases applying the cause analysis and research has

not revealed additional cases. The first case is *Koelling*, 729 S.W.2d at 251-53, in which a driver

hit two separate cars "almost simultaneously" while trying to pass one of the cars on a two-lane

highway. The driver's liability insurance policy limited the amount he could recover in "one

accident regardless of the number of claims or vehicles involved." *Id.* at 252. The court held that

"the cause approach more closely reflects the intentions of the parties who entered into the insurance

contract." *Id.* at 253 (emphasis removed). Distinguishing the circumstance in which the driver had

time to regain control between collisions and applying the cause approach, the court concluded that

"it [was] clear that only one accident occurred." *Id.* In the other case, *McBee*, No. 08-0534-CV-W-

HFS, 2009 WL 1124973, at *1, the insured's dog got loose and attacked a husband and wife jogging

together. The insured's homeowner's liability policy had a per-occurrence limit and defined

"occurrence" as "an accident, including continuous or repeated exposure to substantially the same

---

[1] The court in *McBee* distinguished a line of Missouri cases applying an "effect" analysis where the issue
was the timing of the occurrence. No. 08-0534-CV-W-HFS, 2009 WL 1124973, at *3 (citing *Nationwide
Ins. Co. v. Central Missouri Elec. Cooperative, Inc.*, 278 F.3d 742 (8th Cir. 2001); *Shaver v. Ins. Co. of N.
Am.*, 817 S.W.2d 654 (Mo. App. 1991)). Neither party in the present case argues that the "effect" approach
should be used. And, as explained in *McBee*, there is does not appear to be any authority for applying that
test under Missouri law when the issue is the number, rather than the timing, of the occurrences.

general harmful conditions during the policy period, resulting in bodily injury or property damage." *Id.* at *2. The policy also stated that "[a]ll bodily injury and property damage resulting from continuous or repeated exposure to the same general conditions is considered the result of one occurrence." *Id.* Citing *Haulers Ins Co., Inc. v Wyatt*, 170 S.W.3d 541 (Mo. App. 2005), an earlier case that had reached the same result, the court held that this language was unambiguous. The court concluded: "In keeping with the 'cause' approach, as illustrated in *Haulers* and *Koelling*, the injuries sustained by each of the McBees, are the result of continuous exposure to substantially the same harmful condition, the failure to prevent the dog's escape, considered as a single incident." *McBee*, No. 08-0534-CV-W-HFS, 2009 WL 1124973, at *5. The dog attack on two people, the court held, was a single occurrence. *Id.*

Although these two Missouri cases illustrate the "cause" approach, they are not particularly useful to analyzing the facts of the present case. Defectively manufactured drill casing that damages four wells is far different from a dog that attacks two people at once or a driver that hits two cars at once. Texas cases that use the "cause" approach, *see Lennar Corp. v. Great Am. Ins. Co.*, 200 S.W.3d 651, 682 (Tex.App.–Houston [14th Dist.] 2006, pet. denied), are more helpful. In *National Union Fire Co. of Pittsburgh v. Puget Plastics Corp.*, 649 F.Supp.2d 613, 627-29 (S.D. Tex. 2009), the insured, Puget Plastics, manufactured defective plastic water chambers that were incorporated into hot water heaters. During the period covered by the disputed insurance policy, approximately 800 of the chambers failed. *Id.* at 627 n. 16. As in the present case, the insured was required to pay a self-insured retention for each occurrence. The insurer argued that each failed water chamber was a separate occurrence. The district court rejected this argument, explaining that, under the "cause" approach, "[a] single occurrence may result in multiple injuries to multiple parties over a period of

11

time." *Id.* at 628.  (citing *H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co.*, 150 F.3d 526, 534 (5th Cir. 1998)).  Because the focus is on causation, there would only be multiple occurrences if an intervening cause interrupted the original causal event.  *Id.* (citing *H.E. Butt Grocery*, 150 F.3d at 534).  Surveying a number of cases from Texas and other jurisdictions, the court observed that "[w]here courts have found that the distribution of a defective product yields multiple occurrences, the determinative factor has been the 'number of causal events, not the number of claims or claimants.'"  *Id.* (quoting *Sting Sec., Inc. v. First Mercury Synd., Inc.*, 791 F.Supp. 555, 560 (D. Md.1992)).  Based on "Texas (and nationwide) precedent supporting the finding of a single occurrence when liability stems from a manufacturer's defects," the court concluded that Puget Plastics' failure to mold the water chambers properly was a single occurrence because it was "the most intuitively plausible 'cause' of Puget's liability."  *Id.*

As in *Puget Plastics*, the property damage in the present case arose out of a single manufacturing defect and the manufacturer is the insured.  The reasoning in *Puget Plastics* is persuasive and applies here as well.[2]  The liability-causing event was Maverick's defective manufacturing of the drill casing.  All of the damage flowed proximately from the manufacturing defect.  Neither the sale of the casing nor its installation, as Westchester suggests, were necessary to make Maverick liable.  Nor did those later events interrupt the causal chain.  The "cause" analysis supports a conclusion that Maverick's defective manufacturing was a single "occurrence."

---

[2]  Westchester argues that the discussion of the number of occurrences in *Puget Plastics* is dicta because the court went on to hold that there had been no occurrence at all based on its finding, after a bench trial, that the damage suffered was "highly probable."  *Puget Plastics*, 649 F.Supp.2d at 644-46.  This court relies on the persuasive reasoning of that opinion.

The cases Westchester cites do not support a different result.  In *Maurice Pincoffs Co. v. St. Paul Fire & Marine Ins. Co.*, 447 F.2d 204, 206-07 (5th Cir. 1971), the insured imported already contaminated bird seed and sold it to eight separate dealers, who resold the seed at retail.  The contaminated seed killed some retail customers' birds.  The Fifth Circuit held that each of the eight sales to the dealers was a separate "occurrence."  *Id.* at 207.  The court reasoned that although the contaminated seed caused the injuries to the birds, the insured's "liability resulted from the event of its sale of the seed."  *Id.*  If the insured had destroyed the seed before selling it, "there would be no occurrence at all for which the insured would be liable.  But once a sale was made there would be liability for any resulting damages."  *Id.* at 206.  The sale of the seed, not the preexisting contamination, was what exposed the bird owners to a condition resulting in property damage, "[a]nd for each of the eight sales made by [the insured], there was a new exposure and another occurrence."  *Id.*  The insured in *Maurice Pincoffs* was not the seed manufacturer, but the importer and wholesale distributor.

Westchester also cites *Lennar Corp.*, 200 S.W.3d at 681-83.  In that case, the insured built and sold homes covered with a synthetic stucco material called Exterior Insulation and Finish System ("EIFS"), which had been manufactured by a third party.  A defect in the EIFS trapped water and did not allow it to drain, which led to damage (or at least the risk of damage) such as wood rot, mold, and termite infestation in many of the houses.  Relying on *Maurice Pincoffs*, 447 F.2d at 205-06, the Texas appellate court rejected Lennar's argument that installing the EIFS in all the homes was a single occurrence because the product defect was the cause of all the damage.  The court explained its reasoning as follows:

> The fact that EIFS is generally a defective product that traps water
> would not have resulted in Lennar's liability to each homeowner

13

> absent application of EIFS to each home. *Lennar was not the designer or the manufacturer of EIFS.* Rather, Lennar's liability stemmed from the fact that it built and sold homes with EIFS. Thus, Lennar's liability to a particular homeowner stemmed from the application of EIFS, and the resulting damage, if any, to his or her particular home. Further, there was not one entrapment of water that caused damage to all the homes. Instead, the EIFS's entrapment of water on a particular home caused the damage to that home only. Therefore, Lennar was exposed to a new and separate liability for each home on which EIFS was applied.

*Lennar Corp..* 200 S.W.3d at 682-83 (emphasis added).

In the present case, by contrast, the insured was not the seller or the installer of a defectively manufactured product. The insured was the manufacturer. Like the insured in *Puget Plastics*, Maverick would have been subject to liability for the defect regardless of who installed or sold the drill casing to the customer. It is true that, as in *Maurice Pincoffs*, Maverick could have prevented any liability by deciding not to distribute the product. But that would not have prevented the causal chain from forming; rather, that would have interrupted a causal chain that had already formed when the defect in Maverick's manufacturing process produced defective casing. The single defect in the manufacturing process, not the eleven downstream sales of the casing or its installation in the four wells, was the event that triggered Maverick's liability and exposed others to harm. Under the approach used in both Missouri and Texas, the critical fact is the "number of causal events, not the number of claims or claimants." *Sting Sec.*, 791 F.Supp. at 560. This record shows only one such event – the defect in Maverick's manufacturing process – and a single covered occurrence.

## III.    Segregating Claims

### A.    The Applicable Law

Westchester argues that Maverick must allocate its settlement with Dominion between covered and uncovered claims. Under Missouri law, "a settlement encompassing both covered and

noncovered claims must be fairly apportioned between the two." *Esicorp, Inc. v. Liberty Mutual Ins. Co.*, 193 F.3d 966, 971 (8th Cir. 1999); *see also Royal Ins. Co. of Am. v. Kirksville College of Osteopathic Medicine, Inc.*, 304 F.3d 804, 807 (8th Cir. 2002).  "In the case of a liability insurer's refusal to defend an action against the insured which involves both claims within the coverage of the policy and claims which are not covered by the policy, if the liability insurer fails to defend the action, and the insured unsuccessfully defends the action, then the insurer is liable for the recovery against the insured if such recovery is on a claim covered by the policy, but no liability for the recovery will rest upon the insurer if the recovery is on a noncovered claim." *Dickman Aviation Servs., Inc. v. U.S. Fire Ins. Co.*, 809 S.W.2d 149, 152 (Mo. App. 1991) (quotation omitted).

### B.    Analysis

Westchester's argument for apportionment is based on language in Maverick's settlement agreement with Dominion stating that it was in satisfaction of "all" potential claims.  According to Westchester, this is "broad enough to encompass claims for fraud, fraudulent misrepresentation, and other intentional torts that clearly would not be covered by the Westchester policies." (Docket Entry No. 88 at 10).  Westchester raised this argument several times throughout the litigation, including in its petition for panel rehearing of the Fifth Circuit's opinion, which the court denied.

Nothing in the record supports the argument that Maverick's settlement with Dominion is attributable to any uncovered claims.  The typical broad release language in the settlement agreement, standing alone, is not sufficient to show that such claims were covered by the settlement. The only claim asserted by Dominion against Maverick was a breach of warranty claim.

As support for its argument that there could be a hidden fraud claim, Westchester cites to another lawsuit a different customer filed against Maverick relating to the defective casing.  In that

case, *Barrow-Shaver Resources Company v. Maverick Tube, LP*, Cause No. 2007-54442, filed in the Harris County, Texas District Court, in addition to breach of warranty claims, the plaintiff sued Maverick for fraud and for intentional violations of the Texas Deceptive Trade Practices Act. (Docket Entry No. 88, Ex. 4).  Dominion's demand letter to Maverick did not assert any claim other than breach of warranty.  And, as Maverick points out, Barrow-Shaver's fraud claim was apparently based on the allegation that Maverick knew its manufacturing process was faulty *because of the claims made by Dominion.*  (*See id.* at 11).  Dominion could not have made the same claim.

Instead, the record supports Maverick's argument that there were no uncovered losses. Dominion's demand letter stated Dominion's and Maverick's mutual understanding that all the damages sought "[fell] within Maverick's published Warranty Policy."  (Docket Entry No. 46, Ex. J at 5).  The Fifth Circuit held that "the casing failure constituted an occurrence that resulted in property damage."  *Westchester*, 590 F.3d at 324.  The record provides no basis to find that Maverick's settlement extended to uncovered losses or to impose any duty to segregate covered losses from uncovered losses.

## IV.    Attorneys' Fees

Maverick seeks attorneys' fees.  The Federal Declaratory Judgment Act ("FDJA") allows a party to obtain further necessary relief against an adverse party in a declaratory judgement action but "does not by itself provide statutory authority to award attorney's fees that would not otherwise be available under state law in a diversity action." *Mercantile Nat'l Bank v. Bradford Trust Co.*, 850 F.2d 215, 218 (5th Cir. 1988).  In *Utica Lloyd's of Texas v. Mitchell*, 138 F.3d 208, 210 (5th Cir. 1998), the Fifth Circuit clarified that the otherwise applicable state law must be substantive, rather than procedural, to permit a fee award in federal court.  The court held that the relevant provision

of the Texas Declaratory Judgment Act was procedural and did not provide a basis for a fee award. *Id.*  In the present case, the parties agree that Missouri law applies.  Under Missouri law, Maverick is not entitled to recover attorneys' fees.

Like Texas, Missouri has adopted the American rule.  Absent statutory authorization or contractual agreement, each litigant bears its own attorneys' fees.  *County Court of Washington County v. Murphy*, 658 S.W.2d 14, 16 (Mo. 1983) (en banc).  Maverick cites § 527.100 of the Missouri Declaratory Judgment Act, ("MDJA"), which provides that in a declaratory action a court may award "costs as may seem equitable and just." MO. STAT. § 527.100.  Although Missouri courts have held that "costs" may include attorneys' fees, *see Labor's Education and Political Club Independent v. Danforth*, 561 S.W.2d 339, 350 (Mo. 1978),  subsequent cases have clarified that attorneys' fees may be awarded as costs under § 527.100 only under "very unusual circumstances." *See David Ranken, Jr. Tech Inst. v. Boykins*, 816 S.W.2d 189, 193 (Mo. 1991) (en banc), *overruled on other grounds by Alumax Foils, Inc. v. City of St. Louis*, 939 S.W.2d 907 (Mo. 1997) (en banc) ("In the absence of contract or statute, our courts have rarely found the very unusual circumstances that permit the award of attorneys' fees"); *see also Mayor, Councilmen, & Citizens v. Beard*, 636 S.W.2d 330, 331 (Mo. 1982) (en banc) (distinguishing *Danforth* and finding that "costs" did not automatically include attorneys' fees).

The Missouri special-circumstances exception to the American rule is narrow and strictly applied.  *Washington University v. Royal Crown Bottling Co. of St. Louis*, 801 S.W.2d 458, 469 (Mo. App. 1990).  Allowable exceptions include collateral litigation distinct from the suit to prove the breach itself; a declaratory judgment claim that is clearly baseless under published law; and "intentional misconduct" during litigation. *American Home Assur. Co. v. Pope*, 487 F.3d 590, 606

17

(8th Cir. 2007).  The exceptional facts giving rise to a claim for attorneys' fees must be specifically pleaded in a Missouri declaratory judgment action.  *Commonwealth Land Title Ins. Co. v. St. Johns Bank & Trust Co.*, No. 4:08-CV-1433 CAS, 2010 WL 338047, at *4 (E.D. Mo. Jan 22, 2010). Maverick has not specifically pleaded (or even suggested) that any exceptional situation justifying an award of attorneys' fees under Missouri law is present.  Nor is there any basis in the record for such a finding.  Maverick is not entitled to its attorneys' fees under Missouri law or under the FDJA.

## IV.     Prejudgment Interest

### A.     The Applicable Law

The remaining question is when prejudgment interest began to accrue.  The parties do not dispute that prejudgment interest should be awarded.  Under Missouri law, parties are entitled to prejudgment interest at the rate of 9 percent per annum "for all moneys after they become due and payable, on written contracts . . . after they become due and demand of payment is made."  MO. STAT. § 408.020.  "Three requirements must be met before such interest can be awarded on a claim: '(1) the expenses must be due; (2) the claim must be liquidated or the amount of the claim reasonably ascertainable; and (3) the obligee must make a demand on the obligor for the amount due.'"  *Jablonski v. Barton Mut. Ins. Co.*, 291 S.W.3d 345, 350 (Mo. App. 2009) (quoting *Lucent Techs., Inc. v. Mid-West Elecs., Inc.*, 49 S.W.3d 236, 246 (Mo. App. 2001)).

A claim is liquidated "when the amount due is 'fixed and determined or readily ascertainable by computation or a recognized standard.'"  *Id.* (quoting *J.R. Waymire Co. v. Antares Corp.*, 975 S.W.2d 243, 248 (Mo. App. 1998)).  "In Missouri, a claim for damages does not have to be calculated exactly for the damages to be considered liquidated."  *City of Sullivan v. Truckstop*

*Restaurants, Inc.*, 142 S.W.3d 181, 196 (Mo. App. 2004) (holding that damages were liquidated even though an expert had reached several different calculations before making his final damage computation).  Damages may be ascertainable even if the parties disagree as to their amount. *Jablonski*, 291 S.W.3d at 350.  "An award of less damages than requested does not prohibit an award of prejudgment interest on the damages awarded."  *City of Sullivan*, 142 S.W.3d at 196 (citing *A.G. Edwards & Sons, Inc. v. Drew*, 978 S.W.2d 386, 396 (Mo. App. 1998)).

### B.    Analysis

There is no dispute that Maverick made a demand for payment when it forwarded Dominion's demand letter to Westchester via e-mail on December 7, 2006.  (Docket Entry No. 46, Ex. J at 2).  The parties dispute when the claim became "due and payable" and when the damages were ascertainable.  Maverick argues that the appropriate date is December 13, 2006, when Westchester sent the first letter responding to the claim.  In the alternative, Maverick suggests that the claim accrued on January 25, 2007, when Westchester formally denied coverage.  Westchester contends that prejudgment interest did not accrue until Maverick and Dominion settled, on March 16, 2007.

Maverick cites three cases for the proposition that a claim on an insurance contract is "due and payable" on the date the insurer denies the claim.  In *Francka v. Fire Ins. Exchange*, 668 S.W.2d 189 (Mo. App. 1984), the court upheld a jury's verdict that a homeowner was entitled to recover under his fire insurance policy.  For the purposes of prejudgment interest, the court stated that the claim "became payable when defendant denied the claim."  *Id.* at 191.  The second case Maverick relies on, *Commercial Union Assurance Co. of Australia, Ltd., Melbourne v. Hartford Ins. Co.*, 86 F.Supp.2d 921, 932 (E.D. Mo. 2000), was a contribution action by one insurer against another

19

insurer for damage to helicopter parts sustained during shipment.  Both policies were first-party insurance policies purchased by the company that had ordered the parts.  The court held that prejudgment interest was appropriate beginning on the date that the insurer denied the claim.  *Id.* The third case cited by Maverick, *Grantham v. Shelter Mut. Ins. Co.*, 721 S.W.2d 242, 245-46 (Mo. App. 1986), is a first-party property insurance case in which the court awarded prejudgment interest as of the date the insurer "replied to [the insureds'] proof of loss by offering only to pay an amount less than the full claim."

Westchester argues that *Francka* is not relevant because it concerns first-party insurance and property damage to the insured's home "rather than an unknown amount to be paid under a third-party liability policy."  (Docket Entry No. 94 at 3 n.5).  More generally, counsel for Westchester argued at the June 22, 2010 hearing that first-party cases were distinguishable from third-party cases because, in the former category, the loss amount would be determined when the claim was made. This argument does not undercut the holdings in these cases that the claims became payable when they were denied.  Any concern that the damage amount may be too uncertain to permit accrual of prejudgment interest is addressed by the "ascertainability" prong of the analysis.

Westchester also cites *KV Pharmaceutical Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 4:05CV270 CDP, 2006 WL 1153825 (E.D. Mo. 2006).  The insured in that case, KV, settled an underlying dispute with a third party for $4.5 million and then sued its primary and excess insurers to recover the settlement amount.  Before trial, the primary insurer settled and paid KV the $1 million policy limit.  At trial, the jury decided that the entire $4.5 million was covered by the policies, which meant that the excess insurer, National Union, owed $3.5 million.  *Id.* at *1.  The *KV Pharmaceutical* opinion addressed the prejudgment interest owed by National Union on that

20

$3.5 million judgment.  The court awarded prejudgment interest as of the date of the underlying settlement.  *Id.* at *2.  The court looked to the excess policy, which stated that damages were payable after the primary insurance limit had been exhausted.  The primary insurance was not exhausted until KV settled with the primary insurer before trial in the coverage litigation.  The court stated that it would be inequitable to reduce the excess insurer's prejudgment interest obligations because the primary insurer had improperly denied coverage.  "If the plaintiff had never settled with the primary insurer and the jury awarded a verdict against both insurers, they would each be liable for prejudgment interest from the date of the settlement."  *Id.*  The court found it appropriate to ensure the same result despite KV's settlement with the primary insurer, holding that "[t]he money became due and payable upon KV's payment of the $4.5 million."  *Id.*  Westchester argues that *KV Pharmaceutical* establishes a general rule that there is no "damage" sustained in a third-party policy until the insured actually pays the underlying claim.

*KV Pharmaceutical* does not support such a broad rule, either factually or legally.  The facts provided in the opinion are sparse.  There is no indication in the opinion whether National Union denied KV's claim before the settlement with the underlying claimant was reached.  Indeed, the opinion does not even state whether KV made a claim on either insurance policy before settling with the claimant.  If National Union did not deny KV's claim before the settlement was reached, there would have been no reason for the court to consider whether prejudgment interest began to accrue when the claim was denied.  KV filed the coverage suit after the underlying settlement.  In the present case, by contrast, before the underlying settlement was reached, Maverick made a claim, Westchester sent two responsive letters, one reserving rights and one formally denying the claim, Westchester filed a declaratory judgment action, and Maverick filed a breach of contract action.

The broad legal rule that Westchester advocates is also unsupported.  If damages are never "due and payable" under a third-party insurance policy until the insured actually pays the underlying claimant, that would severely restrict prejudgment interest in a wide swath of coverage suits.  In many cases, including this case, the coverage suit is filed before the underlying case is resolved.  If the underlying dispute did not settle but instead proceeded to trial, it might not conclude until long after coverage litigation proceeded to final judgment.  Such a rule would minimize the benefits of prejudgment interest that the *KV Pharmaceutical* court emphasized.  The court quoted the Eighth Circuit's "equitable rationale" that the "'insurer has long had the benefit of [the insured's] advances, and should pay for the use of the funds." *Id.* at *2 (quoting *Nodaway Valley Bank v. Continental Casualty Co.*, 916 F.2d 1362, 1367 (8th Cir. 1990)).  But such compensation is not the only purpose of prejudgment interest.  Again quoting the Eighth Circuit, *KV Pharmaceutical* noted the two purposes of prejudgment interest: "'unless prejudgment interest is available, compensation will be inadequate and defendants will have an incentive to prolong litigation to take advantage of the time value of money.'" *Id.* (quoting *Nodaway Valley Bank*, 916 F.3d at 1368); *see also General Facilities, Inc. v. National Marine Service Inc.*, 664 F.2d 672, 674 (8th Cir. 1981) ("Prejudgment interest serves at least two purposes: (1) it helps compensate plaintiffs for the true cost of money damages they have incurred, and (2) where liability and the amount of damages are fairly certain, it promotes settlement and deters an attempt to benefit unfairly from the inherent delays of litigation.").  The purposes of prejudgment interest favor adopting the rule from the first-party insurance cases that the claim becomes "due and payable" when it is denied by the insurer.

In this case, Westchester denied Maverick's claim on January 25, 2007.  The December 13, 2006 letter Westchester sent Maverick was not a denial of coverage.  It stated that "[w]hile we are

still investigating this matter, and are requesting certain additional information, discussed below, at this time I must respectfully reserve the rights of [Westchester] to deny, disclaim or limit coverage for this matter." (Docket Entry No. 90, Ex. A-1 at 1). Westchester reiterated that its position was "preliminary" and that it was "in need of additional information in order to fully evaluate what, if any, portion of the damages claimed by Dominion may be covered." (*Id.* at 2, 7). After Maverick submitted additional information, Westchester denied the claim on January 25, 2007.

The amount of the claim was also sufficiently ascertainable as of that date. As the parties have stipulated, Dominion's written demand letter sought "$9,802,506.00 for (1) the costs incurred to originally drill the four wells; (2) lost revenue; (3) costs to plug and abandon the wells; and (4) costs to drill four new wells." (Docket Entry No. 95 at 2). Attachments to the demand letter also broke out damages separately for each category for each of the four damaged wells. These were not abstract damages. They were business costs that could be determined using market price data or actual invoices. Maverick submitted Dominion's invoices in responses to Westchester's request for documentation. It is irrelevant to the accrual date for prejudgment interest that the later settlement between Maverick and Dominion was for a lesser amount. *See City of Sullivan*, 142 S.W.3d at 196. It is also irrelevant that Maverick and Westchester disagreed as to the covered amount. *See id.*; *Jablonski*, 291 S.W.3d at 350.

Maverick is entitled to prejudgment interest as of January 25, 2007.

## V.    Conclusion

The casing failure was a single occurrence. There is no evidence of uncovered claims and thus no duty to segregate covered from uncovered losses. Maverick is not entitled to attorneys' fees

but is entitled to prejudgment interest beginning on January 25 2007.   By **July 9, 2010**, the parties

must confer and submit a proposed final judgment consistent with this opinion.

SIGNED on June 28, 2010, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

24